DENNIS BROOKS, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Keystone Steel and Wire, Appellant).

Third District (Industrial Commission Division)   No. 3—92—0557WC

Opinion filed December 13, 1993.

McCULLOUGH, P.J., dissenting.

John A. Maciorowski, of Stevenson, Rusin & Friedman, Ltd., of Chicago, for appellant.

John A. Slevin and S. Linn Baker, both of Vonachen, Lawless, Trager & Slevin, of Peoria, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Employer Keystone Steel and Wire (Keystone) filed a petition pursuant to section 19(h) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 138.19(h)) alleging employee Dennis Brooks' (claimant's) disability to his right eye had subsequently diminished or ended. The Industrial Commission (Commission) granted the section 19(h) petition, finding claimant's disability had materially decreased. The circuit court reversed, finding there was not a sufficient material change in circumstances to warrant the allowance of a section 19(h) petition. Keystone timely filed this notice of appeal. Because we conclude the Commission's decision was against the manifest weight of the evidence, we affirm the judgment of the circuit court.

On May 9, 1978, claimant sustained massive injuries when 15 to

20 tons of steel dropped on him. Approximately three weeks after the accident, claimant began to experience "floaters" or "little white circles" and blurry vision around the edge of his right eye. He could only see a very small clear pinhole through the center of his eye. Claimant had worn corrective lenses for 10 years prior to the accident. He had experienced "floaters" before when he was tired or light-headed; however, he had never before experienced blurriness.

The Commission awarded claimant benefits for his injuries, including an award for 100% loss of use of his right eye. This court affirmed that decision. *Keystone Consolidated v. Industrial Comm'n* (1989), 190 Ill. App. 3d 1108 (unpublished order under Supreme Court Rule 23).

Because of the necessity to the resolution of the issue presented by this appeal, we quote, at length, from the Rule 23 order in this matter:

"On September 25, 1984, Dr. Willi again examined the claimant. In 1978, claimant's best corrected vision in his right eye was 20/400 and 20/20 in the left eye. Now, six years later, his left eye still tested 20/20, and his right eye still tested 20/400. In Dr. Willi's opinion, claimant's vision in his right eye would not improve.

\* \* \*

According to Dr. Willi, when claimant was treated at the hospital, his right eye tested 9 foot over 200 which equalled to a little less than 20/400. This could have been based upon claimant's suggestion in the response that he could not visualize. Dr. Willi agreed that since other members of the claimant's family wore glasses, there was a possibility that in the absence of trauma, there could be a history of macular abnormality in his family. However, according to Dr. Willi, the macular abnormality was not the cause of the angle recession which she interpreted to mean that claimant had received some trauma to the eye. It was the macular abnormality not the angle recession which produced the visual acuity of 20/400. The etiology of the macular abnormality was unknown.

On September 29, 1984, claimant's best corrected visual acuity was 200/400 [*sic*] in his right eye. While there are tests to determine if an individual is malingering or falsifying his responses, Dr. Willi relied on claimant's responses without question. In all probability, the macular damage to claimant's eye was due to trauma. If he had the same vision prior to the accident, it may have been due to some prior trauma.

\* \* \*

On review before the Industrial Commission, the June 2, 1986, report of Dr. Clifford E. Myers was admitted into evidence at the

request of the employer. Dr. Myers found uncorrected vision in the right and left eye to be 20/400. Corrected vision was 20/30 on the right. Dr. Myers indicated that claimant was able to see other parts of the visual acuity chart. The doctor suggested reevaluation and additional testimony."

This court refused to disturb the Commission's decision and noted:

"The Industrial Commission, however, adopted Dr. Willi's finding of corrected visual acuity of 20/400. The Commission found Dr. Myers' finding of 20/30 acuity unpersuasive, 'as he stated that it related only to isolated letters and that petitioner [claimant] could not see other parties [sic] of the acuity chart, such that the report does not address petitioner's visual field. This is consistent with petitioner's testimony at arbitration that he can only see a very small clear, pinhole, with blurriness around the edge.' "

Keystone's section 19(h) petition alleged that an examination conducted by Dr. Morris Bennin on November 25, 1989, substantiated that claimant's "corrected vision had substantially improved or recovered completely as corrected vision in his right eye was stated to be, taking into consideration all factors, at worse 20/25 to conceivably 20/20."

Dr. Bennin conducted an examination of claimant, which lasted approximately three hours, on October 25, 1989. He also reviewed the medical records of Dr. Willi and Dr. Myers. Dr. Bennin tested claimant's uncorrected vision by having him read the Snellen Test Chart. Claimant was only able to read the top line, labeled as 20/400, without corrective lenses. He described three other tests he performed which showed claimant had no corneal curvature defects or surface defect, no defect in the mobility of his eyes, and normal depth perception. Claimant was found to be nearsighted.

Dr. Bennin next tested claimant's visual field. Claimant's left eye was normal; however, claimant's right eye showed a defect paracentrally. Dr. Bennin described this defect as a paramacular scotoma called maculopathy. Dr. Bennin stated claimant's corrected visual acuity in his right eye was 20/25 instead of 20/20 because of the maculopathy.

The Amsler Grid Testing, which has a chart with a dot in the center and squares spread at equal distances apart, with respect to the right eye, showed there was some distortion of the squares just off-center. This is called metamorphopsia and indicates a sensory defect in the paramacular area which was consistent with claimant's visual acuity in his right eye of 20/25 instead of 20/20.

Dr. Bennin found slight pigmentary changes on claimant's right

eye which he believed were probably the cause of his vision being 20/25 in his right eye instead of the normal 20/20. Dr. Bennin diagnosed claimant as having a paramaculopathy in his right eye with a congenital and developmental condition of nearsightedness. He believed the maculopathy in claimant's right eye caused his corrected vision to be 20/25.

Dr. Bennin explained that he determined claimant's corrected vision by placing different lenses in front of claimant's eye and then subjectively determined which letters on the Snellen Test Chart claimant could see best. The smallest letters claimant was able to read were on the 20/25 line. In his opinion, claimant's paramaculopathy was permanent but not a progressive condition. Finally, Dr. Bennin stated that based on the Wisconsin eye chart, a 20/25 reading is calculated to equal a 5% loss of vision.

On cross-examination, Dr. Bennin explained that he found claimant's corrected vision to be 20/25 in his right eye because he was able to pick out a letter on that line on the Snellen Test Chart. He found no medical evidence to support or contradict claimant's complaint that the pinpoint center of his eye is clear but the outside is very blurry. This condition is called a paracentral scotoma which Dr. Bennin diagnosed claimant as suffering from. He admitted that by characterizing claimant's condition as permanent, he meant that claimant's condition would not get any better. Based on his own examination of claimant and his review of the medical records of other doctors, Dr. Bennin believed there was no significant change in claimant's condition from 1979 to when he saw him in 1989. He also opined that the paracentral scotoma predated the 1978 accident.

On redirect examination, Dr. Bennin stated that at arriving at the 20/25 figure for corrected vision, he took into account certain factors, including (1) the best letters claimant could read on the Snellen Test Chart; (2) the degree of scotoma in the peripheral fields; and (3) the Amsler Chart and the ophthalmoscopy (an examination of the interior of the eye). Dr. Bennin believed there could be nowhere near a 100% loss of use of the right eye.

Claimant's supervisor, Leon Stearns, testified claimant's duties included running a main frame computer, loading jobs, submitting jobs, mounting tapes, putting out reports, and entering numerical data into the computer. Claimant's work had always been good and he never had made any complaints regarding his eyes. Finally, two reports from Dr. Willi were admitted into evidence. First, a letter dated September 29, 1984, stated claimant's best corrected vision in his right eye was 20/400.

In a letter dated May 19, 1990, Dr. Willi detailed her past

examinations of claimant from 1978 through 1984 as well as the results of an examination on May 10, 1990. At the May 10, 1990, examination, claimant's vision tested out at 20/25 in his right eye with myopic correction. She noted he had difficulty in reading the line with his right eye. When she questioned him about this, he explained he could see the letters one at a time, but could not read a whole line smoothly.

Dr. Willi found his right macular region was flat compared to the left macula. He had a few tiny white dots in the area surrounding the phobia. Dr. Willi performed an Amsler Grid Test which showed the right eye had a 5-degree central scotoma surrounding fixation. She also performed color-blindness tests and found no angle recession in the right eye. Dr. Willi concluded:

> "My impression at this point is that Mr. Brooks has congenital red-green color blindness, and that he has myopia. The visual acuity in his right eye is correctable to 20/25 now, but with the knowledge that he has approximately 5 degree scotoma surrounding his central fixation point. I'm of the impression that he has had some eye injury in the past, quite possibly occurring at the time of his accident in 1978."

On May 7, 1991, the Commission entered its order granting Keystone's section 19(h) petition and finding that claimant's disability had materially decreased in that he sustained a permanent partial loss of use to the extent of 35%. Specifically, the Commission noted claimant's current job, which he also had at the original arbitration hearing, was as a computer operator and that his work performance was good with no complaints regarding his eyes.

The Commission noted Dr. Bennin's examination of claimant and subsequent diagnosis including the 20/25 corrected vision in his right eye, and his opinion that claimant had nowhere near a 100% loss of use of his right eye. The Commission also relied on Dr. Willi's report of September 29, 1984, which noted 20/400 corrected vision in claimant's right eye since 1978. The Commission found Dr. Bennin's report of the 20/25 corrected vision was an actual improvement since the 1984 exam and noted that Dr. Willi found claimant's corrected vision in 1990 was 20/25, which was consistent with Dr. Bennin's findings. The Commission concluded "claimant's corrected visual acuity is now 20/25 as opposed to the finding of 20/400 at the time of the Commission's decision." It found that claimant's disability had materially decreased to the extent of 35%.

On July 8, 1992, the circuit court reversed the Commission finding that there was not a sufficient material change in circumstances to warrant the allowance of a section 19(h) petition. Keystone timely filed this notice of appeal.

■ The purpose of a proceeding under section 19(h) of the Act is to determine if a petitioner's disability has "recurred, increased, diminished or ended" since the time of the original decision of the Commission. (*Gay v. Industrial Comm'n* (1989), 178 Ill. App. 3d 129, 132, 532 N.E.2d 1149, 1151.) The change in claimant's condition must be material. *International Harvester Co. v. Industrial Comm'n* (1988), 169 Ill. App. 3d 809, 817, 523 N.E.2d 1303, 1308.

In reviewing a section 19(h) petition, the evidence presented in the original proceeding must be considered to determine if the petitioner's position has changed materially since the time of the Commission's first decision. (*Howard v. Industrial Comm'n* (1982), 89 Ill. 2d 428, 430-31, 433 N.E.2d 657, 659.) Whether there has been a material change in a petitioner's disability is an issue of fact, and the Commission's determination will not be overturned unless it is contrary to the manifest weight of the evidence. *United States Steel Corp. v. Industrial Comm'n* (1985), 133 Ill. App. 3d 811, 816-17, 478 N.E.2d 1108, 1112.

■ The most often cited case regarding loss of vision is *Lambert v. Industrial Comm'n* (1952), 411 Ill. 593, 104 N.E.2d 783. In *Lambert*, the supreme court noted there was a conflict among the jurisdictions over which of basically two rules should be utilized to determine the extent of damage to an injured eye. One rule would allow only naked vision as the measure of loss of the eye, that is the extent of the damage would be determined without recourse to corrective lenses. The other rule would require the loss of the eye to be determined by the difference between the eyesight at the time of injury and as corrected by the use of lenses. The supreme court declined to restrict the determination of the extent of eye loss to either rule, noting:

> "The real difficulty, and one of the causes of the lack of harmony in the authorities, lies in the fact that neither rule is adequate to cover all cases. If naked vision, alone, is considered, the worker with corrected vision is not adequately protected, and if corrected vision, alone, is considered, the worker with uncorrected vision is not fully protected. In the first instance, the loss of an eye 'industrially blind' with naked vision, but normal with correction, would not be compensable; in the second, an injury rendering a normal eye industrially blind would not be compensable if it could be corrected to normal by use of glasses." *Lambert*, 411 Ill. at 604, 104 N.E.2d at 788.

In *Walker v. Industrial Comm'n* (1978), 72 Ill. 2d 408, 381 N.E.2d 238, the court quoted the language from *Lambert* and stated that the extent of loss of vision is a question of fact and the Commission's findings with respect thereto will not be disturbed unless contrary to

the manifest weight of the evidence. The court further stated the degree of loss of vision is not to be determined "by a mechanical measurement as to corrected vision or uncorrected vision." (*Walker*, 72 Ill. 2d at 413, 381 N.E.2d at 240.) In *Motor Wheel Corp. v. Industrial Comm'n* (1979), 75 Ill. 2d 230, 388 N.E.2d 380, the court stated the following:

> "*Lambert* stands for the proposition that permanent disability, due to injury of the eyes, is to be determined by actual injury to the victim's eyes as he 'used' them at the time of the injury. If he used no corrective lenses, then the difference between uncorrected vision at the time of the injury and thereafter is the measure of the damage; if he used corrective lenses, then the difference between corrected vision at the time of injury and thereafter is the measure of damage." *Motor Wheel*, 75 Ill. 2d at 239, 388 N.E.2d at 383-84.

However, in *Oscar Mayer & Co. v. Industrial Comm'n* (1980), 79 Ill. 2d 254, 402 N.E.2d 607, the court appeared to retreat somewhat from the language of *Motor Wheel*. The court noted:

> "In *Motor Wheel* we made clear our adherence to the holding in *Lambert*. The comment from *Motor Wheel* on which the respondent relies [quoted above] was not intended as a full statement of the standard of injury or loss. The extent of injury or loss of use is a question of fact to be determined by the Industrial Commission without its being restricted to a standard of uncorrected or corrected vision." *Oscar Mayer*, 79 Ill. 2d at 257, 402 N.E.2d at 609.

In *Gilbert & Shughart Painting Contractors v. Industrial Comm'n* (1985), 136 Ill. App. 3d 163, 483 N.E.2d 392, this court reviewed all of these cases and concluded:

> "The sum of all these authorities appears to be that there is no mechanical standard and that the Commission may base an award for loss of vision on either corrected or uncorrected vision or a hybrid of both according to the particular circumstances of the case." *Gilbert & Shughart Painting*, 136 Ill. App. 3d at 169, 483 N.E.2d at 396.

At the original proceeding in 1978, Dr. Willi found claimant's best corrected vision in his right eye to be 20/400. She tested it again in 1984 and came to the same conclusion. Dr. Willi tested claimant's right eye corrected vision in 1990 and found it to be 20/25. She noted he had difficulty in reading the Snellen Test Chart and when she questioned him about this difficulty, he explained the pinhole vision problem. Dr. Willi noted in her final report that claimant's "visual acuity was correctable to 20/25 now, but with the knowledge that he has approximately 5 degree scotoma surrounding his central fixation point."

Dr. Clifford Myers examined claimant at the time of the original proceeding and found his corrected vision in the right eye to be 20/30. Dr. Myers indicated claimant was able to see other parts of the visual acuity chart. However, the Commission and this court found Dr. Myers' findings unpersuasive. We noted:

"The employer submits that the best means of calculating the actual injury would be by applying corrected vision prior to the accident and corrected vision afterwards. Assuming as the employer does, that claimant had 20/20 vision prior to the incident with the use of glasses, the employer relies on Dr. Myers' report that indicates corrected vision in the right eye of 20/30. Therefore, the employer maintains that, assuming the causal relationship, the appropriate award for the disability to the right eye should not exceed 10 to 15% for the loss of use of the right eye.

The Industrial Commission, however, adopted Dr. Willi's finding of corrected visual acuity of 20/400. The Commission found Dr. Myers' finding of 20/30 acuity unpersuasive, 'as he stated that it related only to isolated letters and that Petitioner [claimant] could not see other parts of the acuity chart, such that the report does not address Petitioner's visual field. This is consistent with Petitioner's testimony at Arbitration that he can only see a very small clear pinhole, with blurriness around the edge.'

As we stated earlier, it is the Commission's function to resolve conflicts in medical testimony. Therefore, the Commission's finding of 100% disability in the use of the right eye will not be disturbed."

Finally, Dr. Bennin conducted an extensive examination of claimant and found his best corrected vision in his right eye was 20/25. This conclusion was based on claimant's ability to read the Snellen Test Chart and the degree of the scotoma in the peripheral fields.

There has not been a material change in claimant's disability sufficient to justify granting Keystone's section 19(h) petition.

As Keystone notes, and claimant admits, his corrected vision has improved since 1987. As stated in *Gilbert*, there is no mechanical standard to be applied and the Commission may base the award for loss of vision on either corrected or uncorrected vision, or a hybrid of both. In our prior decision, we affirmed the Commission's use of the corrected vision standard which adopted the testimony of Dr. Willi that claimant's corrected vision after the accident was 20/400. We further approved the Commission's refusal to adopt Dr. Myers' statements that claimant's corrected vision was 20/30. Because we approved the corrected vision standard in the prior case, the same standard should be applied with respect to this section 19(h) petition.

Both Dr. Willi and Dr. Bennin agree claimant's corrected vision in his right eye is now 20/25. Nevertheless, we note that claimant has consistently complained of the pinhole vision problem he suffers from and we further note there is medical evidence to support his complaint. The basis for the Commission's rejection of Dr. Myers' opinion in the original proceedings was that his finding of 20/30 visual acuity was related only to isolated letters. Dr. Myers stated that claimant could not see other parts of the acuity chart and the Commission found that Myers' report did not address claimant's visual field.

Reviewing Dr. Bennin's deposition testimony in the present proceeding, it appears his finding of 20/25 visual acuity is related to individual letters and did not address claimant's visual field. Dr. Willi likewise found visual acuity to be 20/25 in the right eye, but she noted that claimant had difficulty reading the line with that eye. Claimant explained to her that he could see letters one at a time, but could not see the whole line smoothly.

■ In granting Keystone's section 19(h) petition, the Commission focused exclusively on the report of claimant's corrected visual acuity from 20/400 to 20/25, ignoring claimant's pinhole vision problem. The record clearly demonstrates that claimant continues to suffer from this condition. Both Dr. Willi and Dr. Bennin noted claimant's complaints in this regard and that he could read the letters on the top line of the Snellen chart only one at a time. Given claimant's continuing pinhole vision problem, the improvement in visual acuity in this limited field of vision does not constitute a material decrease in claimant's disability. Accordingly, we find that the Commission's decision finding a material decrease in claimant's disability was against the manifest weight of the evidence. The judgment of the circuit court of Peoria County is affirmed.

Affirmed.

RAKOWSKI, WOODWARD and SLATER, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, dissenting:

In our first decision, we adopted the corrected vision standard in stating:

> "Since the evidence showed that claimant wore glasses at the time of the injury, the standard should be what claimant's corrected vision was subsequent to the accident."

We affirmed the Commission's use of the corrected vision standard which adopted the testimony of Dr. Willi that the claimant's

corrected vision after the accident was 20/400. The majority also correctly states that "[b]ecause we approved the corrected vision standard in the prior case, the same standard should be applied with respect to this 19(h) petition." 263 Ill. App. 3d at 892.

Dr. Bennin, considering the maculopathy of the right eye, found that claimant's corrected visual acuity in his right eye was 20/25 instead of 20/20. The Amsler Grid Testing which considered metamorphopsia of the right eye found the claimant's visual acuity in the right eye to be 20/25 instead of 20/20.

The Commission found as to the section 19(h) petition that claimant's "job performance is good and that he has no complaints about his eyes." The Commission further found that both doctors, Willi for the claimant and Bennin for the respondent, stated: "Petitioner's visual acuity is now 20/25 as opposed to the finding of 20/400 at the time of the Commission's decision."

Dr. Willi and Dr. Bennin noted claimant's complaints with regard to pinhole vision. Both doctors were aware of this problem.

The claimant argues in his brief that Dr. Bennin diagnosed the pinhole vision as paracentral scotoma with metamorphopsia. The terms used by the doctor are defined as follows: "scotoma[—]1. an area of lost or depressed vision within the visual field, surrounded by an area of less depressed or of normal vision" (Dorland's Illustrated Medical Dictionary 1498 (27th ed. 1988)); "paracentral [scotoma][—] an area of depressed vision situated near the point of fixation" (Dorland's Illustrated Medical Dictionary 1498 (27th ed. 1988)); and "metamorphopsia—A disturbance of vision in which objects are seen as distorted in shape" (Dorland's Illustrated Medical Dictionary 1015 (27th ed. 1988)). It is clear that Dr. Bennin considered these conditions when stating the right eye vision was now corrected to 20/25 instead of 20/20. Dr. Bennin's evaluation found congenital color blindness, not caused or aggravated by maculopathy, nearsightedness in each eye, more severe in the left than right, no evidence of corneal defect, equal horizontal nystagmus of no significance as to visual acuity, normal depth perception, the pupils normal in appearance and reaction, normal tear function with the eyes being in normal position, normal ability of the right eye to focus from a distance to near and no evidence of abrasion or erosion of the cornea. Had it not been for the paracentral scotoma with metamorphopsia, claimant's corrected vision would be 20/20.

The claimant at the time of our first decision had 20/400 vision in the right eye and pinhole vision in the right eye. The majority finds that now, based upon 20/25 vision in the right eye and pinhole vision in the right eye, there is no change.

The majority has simply substituted its judgment for that of the Commission in weighing evidence presented in the section 19(h) petition in which the Commission had the prerogative to determine. The Commission, after hearing all of the evidence, determined that the loss of sight in the right eye should be reduced to 35%. It is readily apparent that the decision of the Commission is not against the manifest weight of the evidence and we do not have the prerogative to substitute our judgment.